## JONES v. HUNSICKER et al.*

### No. 5342.

Court of Appeal of Louisiana. Second Circuit.

June 1, 1937.

Rehearing Denied June 30, 1937.
Writ of Certiorari Granted July 9, 1937.

Theus, Grisham, Davis & Leigh, of Monroe, for appellants.

Madison, Madison & Fuller, of Bastrop, for appellee.

HAMITER, Judge.

Total and permanent disability is asserted by plaintiff in this suit which he instituted against his employer, G. R. Hunsicker, and the latter's insurer, Central Surety & Insurance Corporation. He prays for compensation at the rate of $14.50 per week for a period not exceeding 400 weeks, and for medical expenses of $100.

Some of the material allegations of his petition are:

"2. That G. R. Hunsicker had a contract with Hugh M. Morris and James H. White as Receivers of Southern Natural Gas Corporation to lay a pipe line from Perryville, Ouachita Parish, Louisiana, to Darnell, West Carroll Parish, Louisiana, said pipe line to run through the Parish of Morehouse.

"3. That petitioner was employed by the said G. R. Hunsicker to clean the joints of pipe used in the construction of the aforesaid pipe line.

"4. That on July 25th, 1935 petitioner, while in the process of cleaning one of the joints of pipe, along with three other employees of the said G. R. Hunsicker, about four miles southeast of Bastrop, Louisiana near the Collinston-Bastrop Highway in Morehouse Parish, Louisiana, rolled said joint of pipe on his right hand, mashing the first two fingers and causing severe pains to petitioner; petitioner immediately lifted the pipe with both hands in an attempt to remove his right hand, placing a greater part of the strain on the left hand and arm, in fact, the entire left side of his body, and causing the muscles and tendons in his back to be strained and swollen, and the sudden jerk severely injuring his kidneys as hereinafter related.

"5. That said accident was immediately reported to the foreman, a Mr. Rogers, and petitioner, on the same day of the accident, was treated by Dr. J. N. Jones of Bastrop, Louisiana, for the injury by taping his back.

"6. That petitioner was treated by Dr. W. V. Garnier of Bastrop, Louisiana for the said injury from July 27th, 1935 through

*Judgment reversed by Supreme Court 177 So. 576.

August 7th, 1935, who was the doctor petitioner was referred to by his foreman, Mr. Rogers.

· "7. That, as a result of the said injury, petitioner suffered a 'ptosis of the left kidney and a double kink in the left ureter' which makes petitioner helpless to do manual labor.

"8. That your petitioner is an uneducated man, and depends exclusively on manual labor for the support of himself and his family, and as a result of said injury your petitioner is entirely incapacitated from performing same and will never again be able to perform manual labor, the only kind of work by which he can earn a living."

All liability was denied by defendants in the joint answer filed by them.

A solidary judgment was rendered in plaintiff's favor for $7.28 per week during disability, not exceeding 300 weeks, and for $100 for medical expenses.

Appeals from the judgment were prosecuted by defendants. Plaintiff has answered the appeals, asking that the compensation award be increased to $14.56 per week for the period of disability, not exceeding 400 weeks, and that the fees of the medical experts who testified in his behalf be fixed at $25 each.

The appeal calls upon us to determine whether or not plaintiff was injured as alleged, and, if so, the extent of his injuries.

About midnight of July 25, 1935, plaintiff and seven other workmen were engaged in cleaning a joint of heavy iron pipe measuring 18 inches in diameter and 90 feet in length. The method used by them was the striking of the pipe with tire tools or iron rods. They were working for defendant Hunsicker in Morehouse parish, La., in the execution of his contract to lay a pipe line from Perryville to Darnell; both towns being in Louisiana. The chipping of the enamel from one-half of the joint had been completed, and the men were attempting to turn it to clean the remaining portion when the alleged accident occurred.

According to plaintiff's testimony, when the joint was almost over it rolled back, caught the first and second fingers of his right hand between the pipe and ground, and pulled him down. To extricate these members, he placed his left hand on the pipe and, with the aid of the other, lifted and pushed it. In doing this he strained himself. No injury whatever was done to his fingers. They were not bruised, did not bleed, and the nails neither turned black nor fell off. (It is to be observed that his testimony in this respect is at variance with the above-quoted allegations of his petition wherein he averred that his fingers were mashed. Furthermore, it seems incredible that no damage was sustained by such members when the enormous proportions of the iron pipe are considered.) He resumed work, but after striking several more blows, and because of pain in his back, he quit and walked to a motortruck which was parked about 100 yards away. He remained beside this vehicle until morning, when he and the other workmen were conveyed in it to the town of Bastrop. On arrival in that town, he consulted Dr. J. N. Jones, who strapped his back, and then journeyed to his home. About 10 o'clock of the following morning, plaintiff went to the office of Dr. W. V. Garnier, in accordance with instructions given him by his employer's timekeeper, who treated him for several weeks. Thereafter, frequent visits were made to Dr. Jones' office for treatment.

Plaintiff further testified that he was 22 years of age, enjoyed good health prior to the accident, and weighed 178 to 180 pounds. Since his injury he has lost weight, been unable to sleep well at night, and endured much pain. He was a manual laborer, and had only a sixth grade education. For about two years he had worked in a paper mill as an extra. About three weeks before starting on the pipe line project, he quit his millwork because of his inability to earn enough to live on. His wife testified, however, that he ceased working there because of his being laid off when the mill shut down.

Three of his fellow workmen testified that while the pipe was being rocked for the purpose of turning it, plaintiff was caught and jerked to the ground. According to one of these witnesses, this pipe-laying job on which they were working lasted only a few days after the occurrence of the accident.

The record reveals that after being discharged by Dr. Garnier, plaintiff attempted to obtain jobs at a paper mill and a bag mill, but in each instance he was unable to get a favorable medical certificate from Dr. Garnier, who was the official physician for those mills. The job at the bag mill was that of bundling bags. A bundle weighed about 50 pounds.

About the 10th day of August, 1935, plaintiff began work for a governmental agency known as the Emergency Relief Administration. On starting this job, he informed the foreman that he had hurt his back and would like to have light labor. He was assigned the task of driving small grade stakes and keeping a leveling line adjusted in the creation of a football field. These duties lasted until about November 1, 1935. For his efforts, he was paid $47.30 per month, working 16½ days each month. Although this was rather light work, he was compelled to bend over or squat down in driving the stakes, and his work was satisfactorily performed.

During the latter part of November, 1935, he commenced work with the Works Progress Administration, another governmental agency, which was engaged in the construction of a sewerage system for the town of Bastrop, La., and continued there until the day of the trial, which began on March 6, 1936. His first assignment was that of an ordinary laborer, but later he was made a pipe handler. This project called for the digging of trenches of some 4 to 14 feet deep and the laying and cementing therein of joints of sewer pipe measuring from 6 to 15 inches in diameter, and weighing from 60 to 190 pounds each. Plaintiff worked regularly at his task during the usual and required 8 hours per day and 16½ days per month. A preponderance of the evidence shows that he rolled wheelbarrows containing concrete, used a shovel in digging and filling trenches and mixing the cement, handled sections of pipe, and did everything required of him on the job. Mr. Young, the work supervisor of the project, testified that plaintiff rolled wheelbarrows on several occasions which were loaded with about 100 pounds of concrete. He also stated that no mention of an injury or disability was made by plaintiff to him until the latter part of January or the first of February of 1936; this being subsequent to the filing of the suit on January 10, 1936. However, plaintiff testified that while on this sewerage job he rolled a wheelbarrow only one time, and then a very short distance and in which was about 5 pounds of concrete. Also, in contradiction to the supervisor's testimony, plaintiff states that he informed his said superior when he began the work that his back was injured and he could not do heavy labor. The impression sought to be given by plaintiff

with reference to his duties on the sewerage line was that they were extremely light and did not constitute regular manual labor. On the other hand, Mr. R. F. Andrews, a colaborer, when asked if he called the task "piddling around," stated that "it was work. It is not so straining, it is just steady, you have to be going all the time practically." Mr. Henry Bynum, who was foreman of the pipe line crew, and also Mr. Andrews, testified that plaintiff never made a complaint about any injury, that he was a good worker, and that there was no indication that a disability existed.

We proceed now to a consideration of the mass of medical testimony in the record which was given by nine physicians and furnishes many and varied conflicting opinions. The principal theory underlying plaintiff's asserted disability is that his kidneys and attendant organs were injured either by his being jerked to the ground or his lifting the heavy iron pipe, and the greater part of the expert testimony deals with those parts of the anatomy.

As before stated, plaintiff went to the office of Dr. Jones on the morning following the accident. This physician testified that he examined plaintiff, found his back slightly swollen, strapped it, and sent him home. The patient complained of a pain in the small of his back, from about the dorsal vertebra on down. Later, he was often examined and treated by Dr. Jones, as is shown by the following report made to plaintiff's attorney: "On July 6, 1935 I examined Douglas Jones and found him suffering from injured muscles of back. I have treated him continuously from July 26, 1935 till this day. He is still suffering with back and is unable to do manual labor. Just when this man will be able to return to work I can not say as injuries to muscles of his back make it very difficult to make a prognosis."

On the morning of July 27, 1935, Dr. Garnier performed an examination of his back. Although plaintiff complained of pain, no objective symptoms or evidence of injury were present. The trouble was diagnosed as lumbar strain, and his back was strapped with adhesive tape. The lumbar area is described by Dr. Garnier as the lower back from the pelvis to the ribs. Between the thoracic and lumbar region is the kidney area. No pain at the time was indicated there. He made a urinalysis and found neither blood nor pus. Plaintiff

was treated by this doctor until August 8, 1935, when he was discharged as being able to return to work. On this last-mentioned date, Dr. Garnier, who is examining surgeon for the paper mill, was called upon for a report relative to plaintiff's physical fitness for work at such mill. This report was unfavorable. The physician first testified that he certified the applicant as having been treated recently for a back injury. When asked if there were other facts furnished the mill regarding plaintiff, he stated: "That is entirely between me and the company." He was later propounded the question, "Was the reason that you refused to certify him to the paper mill the fact that he had previously stated he knew the Hunsicker job was going to play out and he was going to ride insurance for a while?" His answer was, "Yes, sir." In connection with this, it might be observed that Miss Grace Sawyer, a nurse in the employ of Dr. Garnier, testified, regarding plaintiff's stating to her on July 27, 1936, that, "he knew the job was going to play out in a few days and he might as well get it out of the insurance company."

Dr. W. A. Rogers made an external examination of plaintiff on November 21, 1935, and found a definite area of tenderness on the left side about the first dorsal vertebra. A urinalysis was also made by him. This showed an occasional pus cell, but not enough to have any pathological significance. No blood was found. His written report reads in part:

"Physical examination: He is fairly well developed and nourished white male, age 22 years; skin negative for eruptions or disease; pupils equal and react to light and distance; condition of teeth fair; throat negative; there is no limitation of motion in either upper or lower extremities; there is an apparent slight limitation of motion in forward and lateral movements involving the back muscles on the left side; there is a painful area in the muscles of the left side of the back, in the region between the first and third dorsal vertebrae about two inches from the mid line externally. I was unable to elicit any other objective signs of injury.

"Conclusion:—In my opinion this man is suffering a partial disability due to a traumatic injury of his back muscles and ligaments due to an attempt on his part to extricate his hand from under the above mentioned pipe."

On December 21, 1935, an examination was made by Dr. A. G. McHenry. Because of his being able to feel the left kidney, he thought that plaintiff had ptosis of that organ. He recommended that the patient see a urologist.

Dr. B. M. McKoin, a urologist, made a cystoscopic examination and also X-ray pictures of plaintiff on December 23, 1935. According to his testimony, these pictures revealed a ptosis of the left kidney causing a kink of the ureter of the upper third at the lower border of the third lumbar vertebra, and an enlargement of the functioning part of that kidney. Also he found the left kidney slightly lower than the right, whereas usually, but not always, their positions are otherwise, and there was a kink in the ureter on the right side. The functioning of the left kidney was perfect. When plaintiff came to Dr. McKoin he complained only of pain on the left side of his back.

On February 19, 1936, defendants filed a motion in court alleging "that defendants have requested and demanded a physical examination of plaintiff which contemplates a complete urological examination, and although plaintiff has had such an examination made by doctors of his own choice he has and does now refuse to allow such an examination to be made by defendants," and praying that "plaintiff be ordered to submit to a complete urological and physical examination by doctors of their choice." Two days thereafter, the motion was heard and the requested order granted. Subsequently, or on March 1, 1936, Dr. Moore, a roentgenologist, and Dr. Milam, a urologist, examined plaintiff at the St. Francis Sanitarium in Monroe at defendants' request. The former made X-ray pictures and a pologram of the kidneys, while the latter made physical and cystoscopic, or urological, examinations. These last-mentioned pictures, according to Dr. Moore, showed the beginning of hydronephrosis in the right kidney, but none in the left, and that kinks existed in both ureters. The kidneys appeared to be in proper and normal range. Dr. Milam testified that the patient complained of no direct pain in the region of the kidneys, but claimed that it was in the lower part of his back in the lumbar region. His examination revealed that on the right side there was a normal movement of the kidney of about one-half an inch and a kink in the ureter. On the left there was a partial kink in the uterial-pelvic juncture,

and a movement of the kidney of about one-half inch. The left kidney possessed perfect drainage and no hydronephrosis, while there was a slight degree of it in the right. Both kidneys were in normal range.

During the trial of the case, the X-ray plates made by Dr. McKoin and also those taken by Dr. Moore were presented to all of the medical experts above named, and to others whose testimony we have not discussed. After viewing them, various opinions were expressed regarding the condition of plaintiff's kidneys and ureters. We shall not discuss these opinions in detail, for no benefit would flow therefrom. Some thought that plaintiff's condition was caused by the strain or jerk which he claims that he suffered, and that it was sufficient to render him totally and permanently disabled. Others were equally as positive that the condition was congenital and not traumatic, and that there was no disability on plaintiff's part. Perhaps, from a numerical standpoint, the experts favored plaintiff's theory; but a general and well-recognized principle of law is that testimony must be considered in the light of probability, and not by counting the number of witnesses on each side.

The evidence in the case is conclusive that the pain claimed to have been experienced by plaintiff was on the left side of his back. It is also to be found in the record that many people possess kinks in their ureters, as marked and severe as the ones plaintiff had, who experience no ill effects therefrom, and are able to perform manual labor. Furthermore, as we have seen, the kink in his left ureter furnished no hindrance to the natural drainage of the kidney.

It is a rule of law that in compensation suits, such as this, a construction of liberality must prevail; but it is also well recognized that even in such suits the plaintiff has the burden of proving his case by a preponderance of the evidence. Taylor v. Southern Carbon Co. (La.App.) 153 So. 597, and cases therein cited. In view of the conflicting medical testimony in the record, of the fact that plaintiff actually performed manual labor for many months subsequent to the time of the claimed occurrence of the accident, of the various discrepancies and inconsistencies found and noted in his testimony, and of the other circumstances to which we have above referred, the conclusion must be reached that he has not discharged the burden imposed upon him.

Accordingly, the judgment of the trial court is reversed and set aside, and plaintiff's suit is dismissed at his cost in both courts.